1

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
karl@kr.law
Katherine E. Hollist (*pro hac vice* forthcoming)
kate@kr.law
Leah Rosa Vulić (Bar No. 343520)
leah@kr.law
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

2

3

4

5

6

7

8

**POLLOCK COHEN LLP**
Raphael Janove (*pro hac vice* forthcoming)
rafi@pollockcohen.com
Adam Pollock (*pro hac vice* forthcoming)
adam@pollockcohen.com
George Krebs (*pro hac vice* forthcoming)
gkrebs@pollockcohen.com
111 Broadway, Ste. 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar (*pro hac vice* forthcoming)
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

9

10

11

12

13

14

*Attorneys for Plaintiffs and the Proposed Classes*

15

16

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

17

18

19

20

21

**YOVANNI YANEZ, AND EMELYN MATOS,** on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**FUNPLUS INTERNATIONAL AG,** a Swiss public limited company, and **KINGSGROUP HOLDINGS,** a Cayman Islands corporation,

Defendants.

Case No. 4:23-cv-2667

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**

1

**TABLE OF CONTENTS**

2  **PRELIMINARY STATEMENT**..................................................................................1

3  **JURISDICTION AND VENUE**..............................................................................3

4  **INTRADISTRICT ASSIGNMENT**........................................................................5

5  **ACTUAL ALLEGATIONS**....................................................................................5

6  **False Strikethrough Packs** ...........................................................................13

7  **False Bonus Packs** .......................................................................................15

8  **False Limited Availability Packs** ..................................................................16

9  **Loot Boxes** ...................................................................................................18

10 **CLASS ALLEGATIONS** ....................................................................................21

11 **CALIFORNIA LAW APPLIES TO ALL CLASSES**..................................................25

12 **FIRST CLAIM FOR RELIEF (UCL)** ....................................................................26

13 **SECOND CLAIM FOR RELIEF (FAL)** .................................................................31

14 **THIRD CLAIM FOR RELIEF (CLRA)** ..................................................................32

15 **FOURTH CLAIM FOR RELIEF (Fraud)** .............................................................34

16 **FIFTH CLAIM FOR RELIEF (Unjust Enrichment)** ..............................................35

17 **SIXTH CLAIM FOR RELIEF (NY Law)**..............................................................35

18 **PRAYER FOR RELIEF**......................................................................................36

19 **DEMAND FOR JURY TRIAL**............................................................................39

20

21

22

23

24

25

26

27

28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  Plaintiffs Yovanni Yanez ("Yanez") and Emelyn Matos ("Matos") (each a "Plaintiff"
2  and, collectively, "Plaintiffs") on behalf of themselves and all others similarly situated, by
3  and through their attorneys, for their Complaint against FunPlus International AG and
4  KingsGroup Holdings (collectively, "Defendants" or "FunPlus") allege, on knowledge as to
5  their own actions, the investigation of Plaintiff's counsel, and otherwise upon information
6  and belief, as follows:

7  **PRELIMINARY STATEMENT**

8  1.  This is a class action lawsuit against FunPlus for falsely advertising price
9  discounts for in-game purchases and other deceptive and unfair business practices in its
10  mobile application game (or "app"), Frost & Flame: King of Avalon ("KOA"). KOA is among
11  the highest grossing mobile strategy games across both Apple and Android devices, with
12  over 100 million downloads and an estimated revenue in excess of $80 million per month.

13  2.  Since its 2016 inception, KOA has generated over a billion dollars in revenue
14  by offering players "microtransactions"—the ability, while in the game, to make discrete in-
15  app purchases of in-game valuables necessary to level up one's account. These in-app
16  purchases, or "packs," generally range in price from $0.99 to $99.99 each.

17  3.  However, in its direct marketing to consumers (including representations
18  made at the time of purchase), FunPlus advertises false former prices to induce players
19  into believing they must act quickly to take advantage of a limited-time sale price.

20  4.  Since KOA launched in 2016 and continuing to the present day, FunPlus
21  deceives consumers by offering specific limited-time "bonuses" that purport to massively
22  discount the price of its in-game goods. It uses strikethrough pricing and percentages to
23  trick consumers into believing they are benefitting from limited-time promotions that
24  substantially increase the value of their in-game purchases, especially in relation to
25  purchases made by competing players. These purported savings are false, however,
26  because the original pricing that these ads reference are fabricated.

27  5.  These advertisements have run for years. But at no point, let alone within
28  three months of the advertised discounts, have these in-game items ever actually been

1  offered at a non-discounted price—i.e., without their "limited-time" discounts. In other

2  words, FunPlus never sells these items at their "original" price. It offers false discounts

3  from an original price that did not exist, and its players bought packs on "sale" that were

4  the same prices they would ordinarily pay.

5        6.      Furthermore, the advertised "original" pricing does not reflect the prevailing

6  market retail pricing for these virtual in-game items, which have no real-world value and

7  whose pricing is entirely determined by FunPlus.

8        7.      The Federal Trade Commission ("FTC") describes these kinds of false former

9  pricing schemes as deceptive:

10        One of the most commonly used forms of bargain advertising is to offer a
          reduction from the advertiser's own former price for an article. If the former
11        price is the actual, bona fide price at which the article was offered to the
          public on a regular basis for a reasonably substantial period of time, it
12        provides a legitimate basis for the advertising of a price comparison. Where
          the former price is genuine, the bargain being advertised is a true one. If, on
13        the other hand, the former price being advertised is not bona fide but fictitious
          – for example, where an artificial, inflated price was established for the
14        purpose of enabling the subsequent offer of a large reduction – the "bargain"
          being advertised is a false one; the purchaser is not receiving the unusual
15        value he expects. In such a case, the "reduced" price is, in reality, probably
          just the seller's regular price.
16

17  16 C.F.R. §233.1(a).

18        8.      California statutory and regulatory law also expressly forbid such pricing

19  schemes. Specifically, Cal. Bus. & Prof. Code §17501 states:

20        No price shall be advertised as a former price of any advertised thing, unless
21        the alleged former price was the prevailing market price as above defined
          within three months next immediately preceding the publication of the
22        advertisement or unless the date when the alleged former price did prevail is
          clearly, exactly and conspicuously stated in the advertisement.
23

24        9.      Defendants' tactics to induce players to spend tens, if not hundreds, of

25  thousands of dollars each on purchases fall directly within the dark patterns—manipulative

26  design practices—the FTC identified in its September 2022 report, Bringing Dark Patterns

27  to Light. [1]

28
   _____
   [1] FTC Staff Report, *Bringing Dark Patterns to Light* (Sept. 14, 2022), available at

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

10.    As the FTC Staff Report—Bringing Dark Patterns to Light explains, "SCARCITY," such as a "False Low Stock Message," "[c]reate[s] pressure to buy immediately by saying inventory is low when it isn't."

11.    "URGENCY," like a "Baseless Countdown Timer" or "False Limited Time Message" or "False Discount Claims" also "[c]reate[s] pressure to buy immediately."

12.    Defendants knew, or reasonably should have known, that their comparative price advertising is false, deceptive, misleading, and unlawful.

13.    Defendants have fraudulently concealed from and intentionally failed to disclose to Plaintiffs and the putative class members the truth about their advertised price discounts and former prices.

14.    Through this false and deceptive marketing, advertising, and pricing scheme, FunPlus has violated California law prohibiting the advertisement of goods for sale as discounted from false former prices and prohibiting misleading statements about the existence and amount of price reductions.

15.    The claims and issues asserted herein are governed by California state law. The State of California has the greatest interest in policing corporate conduct occurring within the State.

16.    Upon information and belief, the false advertisements and misleading statements emanated from the State of California, where FunPlus's key executives, subsidiaries, and offices are located.

17.    Plaintiffs, individually and on behalf of all others similarly situated, hereby seek restitution, injunctive relief, punitive damages, attorney's fees, and all other relief which the Court may deem appropriate.

**JURISDICTION AND VENUE**

18.    Plaintiff Yovanni Yanez is a resident of California. He began playing KOA in December 2018. He purchased False Strikethrough Packs, False Percentage Packs, and

---

https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf [hereafter FTC Staff Report—Bringing Dark Patterns to Light].

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  False Limited Availability Packs (defined below) which he otherwise would not have

2  purchased had he known about the deceptive advertising which he reasonably relied upon

3  in making those purchases. He was further double charged for purchases.

4        19.    Plaintiff Emelyn Matos is a resident of New York. She began playing KOA

5  around 2018. She purchased False Strikethrough Packs, False Percentage Packs, and

6  False Limited Availability Packs (defined below) which she otherwise would not have

7  purchased had she known about the deceptive advertising which she reasonably relied

8  upon in making those purchases.

9        20.    FunPlus was founded in California, apparently with the name Halfquest, and

10  has since gone through various iterations of names including "FunPlus" and "KingsGroup".

11  On information and belief, FunPlus has offices in San Francisco, San Mateo, and Irvine,

12  California. Its high-level executives are also located in California, including: (a) Yitao Guan,

13  a resident of Menlo Park and FunPlus International's co-founder and Chief Technology

14  Officer; (b) Andy Zhong a/k/a Yingwu Zhong, a resident of San Francisco and co-founder

15  and Chief Executive Officer; (c) Jeremy Horn, a resident of Los Angeles and VP Head of

16  Innovation; (d) Wei Wang, a resident of Irvine and Chief Creative Officer; and (e) Michael

17  Tong, a resident of San Francisco and Chief Strategy Officer.

18        21.    Defendant FunPlus International AG ("FunPlus International") is a Swiss

19  public limited company. FunPlus International was previously known as (i) KingsGroup

20  Europe SA, (ii) KingsGroup International AG, and (iii) KingsGroup International SA. Its

21  directors include Yingwu Zhong (a/k/a Andy Zhong).

22        22.    Defendant KingsGroup Holdings is a Cayman Islands corporation. Yingwu

23  Zhong (a/k/a Andy Zhong) is one of its two directors.

24        23.    Defendants have operated through an opaque corporate structure. On

25  information and belief, Defendants conduct business or have conducted business through

26  (i) Funplus Interactive USA Inc. d/b/a FunPlus Interactive USA LLC, a Delaware company

27  with its principal place of business in San Francisco, California; and (ii) Imagendary USA,

28  LLC f/k/a FunPlus Interactive USA LLC f/k/a KingsGroup USA, LLC, a Delaware company,

1    with its principal place of business in San Francisco, California.

2        24.    This Court has jurisdiction over this action under the Class Action Fairness

3    Act of 2005. Pursuant to 28 U.S.C. §1332(d)(2), this Court has original jurisdiction because

4    the aggregate claims of the putative class members exceed $5 million, exclusive of interest

5    and costs, and at least one of the members of the proposed classes is a citizen of a

6    different state than Defendants.

7        25.    This Court has personal jurisdiction over Defendants because they have

8    offices and key executives in this District, committed the tortious acts alleged herein in this

9    District, regularly conduct business in this District, and have extensive contacts with this

10   forum.

11       26.    Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a

12   substantial part of the events or omissions giving rise to the claim occurred in this District.

13       27.    In addition, venue is proper in this District under 28 U.S.C. §1391(b)(1), in

14   that all Defendants reside in this District and are subject to this Court's personal jurisdiction.

15       28.    In the alternative, venue is proper in this District under 28 U.S.C. §1391(b)(3),

16   to the extent there is no district in which an action may otherwise be brought under 28

17   U.S.C. §1391(b)(1) – (2), because Defendants are subject to this Court's personal

18   jurisdiction.

19                              **INTRADISTRICT ASSIGNMENT**

20       29.    Because a substantial part of the events which give rise to Plaintiffs' claims

21   occurred in San Francisco and San Mateo counties, pursuant to Local Civil Rule 3-2, this

22   action should be assigned to the San Francisco or Oakland Division.

23                                 **FACTUAL ALLEGATIONS**

24       30.    KOA is a mobile application strategy game developed and operated by

25   Defendants and available on iPhone and Android devices through the Apple App Store

26   and Google Play platforms, respectively. KOA is a fantasy, medieval, strategy, and

27   resource management game. Aside from the fact that the aesthetics and story of the game

28   feature knights, dragons, and evil ice creatures, it otherwise possesses nearly identical

1  gameplay and monetization features to other resource management games developed by

2  Defendants, such as State of Survival, and Guns of Glory.

3      31.    Beginning in 2016, KOA has consistently been among the most downloaded

4  mobile game apps on the Apple and Android app stores, having been downloaded over

5  100 million times by 2022.

6      32.    KOA belongs to a category of apps known as "freemium" apps A freemium

7  app is one in which users do not have to pay to play a fully functional game—the game is

8  free to download and start playing.

9      33.    The term freemium is a misnomer, however, as users are given multiple

10  purchase opportunities, known as microtransactions or in-app purchases ("IAPs"), to

11  augment their playing experience. Users can buy in-game currency, weapons, garments,

12  and even time.

13      34.    The popularity of freemium apps featuring in-app purchases has

14  skyrocketed. In 2022, 97% of apps in the Google Play app store were free-to-download.[2]

15  Even so, in-app purchases accounted for 48.2% of mobile app earnings.[3] KOA has

16  generated over one billion dollars since its creation.

17      35.    Because users can try the app for free, freemium apps acquire new users

18  more rapidly than purchase-to-play apps. Enabling microtransactions at various points

19  throughout game play allows users time to develop app loyalty and engagement before

20  having to pay anything. The continued microtransactions also remove the upper limit of

21  user spending.[4]

22      36.    Most of freemium app revenue is generated by big-spending "whales." In

23  2017, just 6% of customers on Apple's App Store accounted for 88% of all spending on

---

[2] https://www.statista.com/statistics/263797/number-of-applications-for-mobile-phones.
[3] https://www.businessofapps.com/guide/in-app-purchases.
[4] Savannah Wei Shi, et al., *From Minnows to Whales: An Empirical Study of Purchase Behavior in Freemium Social Games*, Int'l J. of Elec. Com. (2015).

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1  games.[5]

2       37.    KOA has generated well over a billion dollars in revenue since its inception.

3  It makes this revenue by offering players in-app purchases. These purchases include

4  building material, hero "badges," speed-ups, and other valuables. An "in-app purchase"

5  refers to a financial transaction initiated from within the mobile application itself. The most

6  common form of in-app purchases is for bundled groups of resources, or "packs," generally

7  ranging in price from $0.99 to $99.99 each.

8       38.    Players engage in "microtransactions" to make in-app purchases containing

9  items that are necessary to progress their account further and maintain competitiveness

10 with other players. This business model contrasts with that of many other popular free apps

11 which offer only non-essential or cosmetic items for purchase. Because KOA offers in-app

12 purchases that advance one's account in direct proportion to the amount of money spent

13 by a player and confer advantages not reasonably attainable by in-game labor alone, it is

14 most accurately classified as a "Pay to Win" mobile game.

15      39.    In other words, a player who spends money in the game will be more

16 powerful in relation to players who choose not to spend money in the game. The game

17 leverages this by bombarding players with advertisements and invitations to buy additional

18 packs and resources whenever they reach a point in the game where their progress has

19 stalled. The game's model is designed to create a sense of urgency around the purchase

20 of in-game resources, and KOA further capitalizes on this sense of urgency by suggesting

21 that purchases are limited-time offerings made available at a substantial discount.

22      40.    The strategies described above to induce players to spend upwards of

23 hundreds of thousands of dollars each are a few of the many deceitful tactics, known as

24 "dark patterns," employed within KOA. "Dark patterns" refer to "a[ny] user interface

25 carefully crafted to trick users into doing things they might not otherwise do," causing

26 players to "engage accidently or unwittingly in monetization activities thereby generating

27 ───────────────
   [5] *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 954 (N.D. Cal. 2021), *aff'd in part,*
28 *rev'd in part and remanded on other grounds*, No. 21-16506, 2023 WL 3050076 (9th Cir.
   Apr. 24, 2023)

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    more income for the developer."[6]

2    41.    As the computer and behavioral scientist Chris Lewis[7] writes, "[t]hese dark

3    patterns violate user expectations by encouraging them to give up or jeopardize some

4    resource to an extent that they were not expecting (time, money, social capital)."[8]

5    42.    Indeed, and as further described below, many of KOA's tactics to induce

6    players to spend over a billion dollars on a "free game" fall directly within the dark patterns

7    the FTC identified in its September 2022 report, *Bringing Dark Patterns to Light*.[9]

8    43.    Prior to downloading KOA, the "Pay-to-Win" nature of the game is withheld

9    or obscured from promotional material directed at potential consumers through various

10   social media channels.  Defendants invest in producing highly elaborate advertisements

11   that suggest a fast-paced game with rousing visuals. For example, in one cinematic

12   advertisement, Defendants feature the actor Orlando Bloom, who formerly played the

13   fantasy role of Legolas in Lord of the Rings, dramatically slaying enemy knights while

14   desperately attempting to wake up a human player in the middle of the night in order to

15   pick up his mobile phone and assist in the fight.

16   44.    Once a player downloads the game, they are placed automatically into a

17   specific "Kingdom," or server, along with several thousand players who also created their

18   accounts at a similar period in time. In stark contrast to the advertisement featuring Mr.

19   Bloom, a player exists merely as a castle upon a mostly visually-simple, two-dimensional,

20   and inert map.  They are immediately tasked with upgrading the level of their "Stronghold"

21   within their city, and the buildings within it. They must do this to strengthen their combat

22   abilities and therefore maintain a competitive position among other players in the server.

23   45.    The purpose of the game is to advance the strength of one's city by

24

25   [6] Dan Fitton, Janet C Read, *Creating a Framework to Support the Critical Consideration of Dark Design Aspects in Free-to-Play Apps*, Assoc. for Computing Machinery 407

26   (2019), available at https://dl.acm.org/doi/pdf/10.1145/3311927.3323136.

27   [7] Chris Lewis, Irresistible Apps: Motivational Design Patterns for Apps, Games, and Web-based Communities (1st ed. 2014).

28   [8] Lewis, *supra* note 17 (internal quotations omitted).
     [9] FTC Staff Report—Bringing Dark Patterns to Light.

upgrading buildings, locating and upgrading heroes, training a large number of strong troops, and maintaining a dragon. The players join large allegiances of other players that compete for dominance within the kingdom through various in-game events.

46.    In order to progress past a certain level in the game, it is necessary to purchase in-app "packs" that contain the required items to level up one's account in the game. These essential items require spending real money, as they are otherwise only available in insufficient amounts through in-game labor alone.

47.    After a few days of playing and regularly making upgrades, the cost to acquire the materials needed to make subsequent upgrades increases exponentially.

48.    In other words, KOA is made up of feedback loops—the output of the system becomes the input for the next iteration of the system. Every action made in the game thus gives the user access to future actions, giving users a sense of player progress and motivation.

49.    At the beginning of the game the time between input and output is immediate and allows the user to complete the next action right away. But as the user performs more actions and levels up in the game, the time between input and output increases. There comes a point in the game where the user can no longer advance due to the time required to complete the next action. At this point, without making an in-app purchase, the user is at a standstill.

50.    Because users are so accustomed to short wait times or using the speed up, skip, or coin (spending in-game resources) features, by the time this standstill occurs (that is, if no additional purchases are made) a user is predisposed to make in-app purchases.

51.    For example, to upgrade one's Stronghold to level 2 costs a trivial number of resources acquired with no labor because sufficient quantities are possessed upon account creation. The upgrade is also completed instantly with one click. But subsequent upgrade costs increase exponentially, with latter levels costing hundreds of millions of resources. Once initiated, these latter upgrades take real-world **weeks** to complete, unless players purchase construction speed-up boosters. For example, after a player gathers the

1    necessary resources to advance from Stronghold level 49 to 50 and clicks "upgrade," the

2    completion time is 81 days 16 hours, 59 minutes, and 48 seconds.

3        52.    If a player does not make any purchases in the game, it would require **years**

4    of playing two hours each day, 365 days a year, to gather the necessary resources to

5    upgrade their Stronghold to 50.

6        53.    Defendants build off the compulsive feedback loops that their game

7    intentionally creates to induce Plaintiffs and other players to spend upwards of hundreds

8    of thousands of dollars each.[10] KOA reminds players that instead of devoting countless

9    hours to progress in the game, they can simply purchase packs. The game designs these

10   upgrades to lure players into spending money on resources.

11       54.    These upgrades all cost players real currency. The packs necessary for

12   these upgrades are generally offered at the following prices: $99.99, $49.99, $19.99,

13   $9.99, $4.99, $1.99, and $0.99. The advertisements for a particular pack at different pricing

14   levels usually have similar graphical advertisements but contain varying amounts of items

15   in proportion to their price.

16       55.    To acquire the resources necessary to reach Stronghold level 30, a player

17   would need to spend approximately $1,400 on packs. However, this cost is never made

18   clear to the player because Defendants know that players would not be willing to pay

19   $1,400 if they were aware of the total cost up front. After all, these are players who

20   _____

21   [10] KOA also employs compulsion loops, a sinister-sounding term for a simple process. To
     create a compulsion loop, game developers make users anticipate a reward, such as a

22   more powerful sword or the prospect of traveling to a new game area. Next, users are
     given a challenge, such as killing monsters or solving a puzzle. By completing the

23   challenge, the user earns their anticipated reward, which in turn presents or unlocks more
     challenges for yet more rewards (*e.g.*, the new game area includes a new quest giver).

24   Compulsion loops can lead to compulsive behavior. Adrian Hon, *You've Been Played: How
     Corporations, Governments, and Schools Use Games to Control Us All*, p. 144. KOA

25   likewise employs treatmills, a refinement of compulsion loops, where incremental gains are
     constantly doled out, with the intention of engaging players indefinitely. Treatmills are

26   designed to ensure the game occupies an enormous amount of a user's time, stays
     relevant as long as possible, and as a result maximizes the time where a user might refer

27   the game to a friend. Games can easily consume hundreds of hours of users' time by
     incrementally unlocking a few more secrets and a few more power-ups after every loop.

28   *Id.* at 152.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    specifically selected a free-to-play game instead of spending $20 to $60 on a traditional

2    video game that is available for one-time purchase, and with the same mechanics.

3         56.   Knowing this, Defendants instead leverage the incremental upgrade system

4    to spread this total cost over numerous separate upgrades, all while keeping consumers

5    in the dark. There is no in-game mechanism to review one's purchase history or the total

6    amount one has spent. Upgrade costs are only shown for those upgrades for which the

7    player is currently eligible, meaning Defendants hide the explosive exponential costs of in-

8    game upgrades until the game's players have already invested months of time and money

9    into the game.

10        57.   Once players are fully invested, Defendants then use packs to create a false

11   sense of urgency and scarcity to pressure players into making several dozen smaller

12   purchases over a period of days, weeks, or months.

13        58.   In other words, at no point are players told it will cost them $1,400 to upgrade

14   their Stronghold to level 30. Instead, they are bombarded with an endless series of

15   advertisements urgently offering limited-time sales, each providing the opportunity to

16   purchase just the incremental resources needed at the time to reach the next level of

17   upgrade.

18        59.   Defendants follow this model intentionally to foster dangerous consumer

19   behaviors that ultimately result in more purchases, at the expense of its players.

20        60.   Research into microtransactions and human behavior shows that a critical

21   link between microtransaction purchases and problem gaming behavior (*i.e.*, behavior

22   associated with gambling addiction) forms with high frequency purchases.[11] Of note, "Both

23   classical and operant conditioning theories suggest that more frequent events or quicker

24   pay out frequencies could increase the likelihood of problematic microtransaction purchase

25   behavior and problem gambling symptoms through reinforcement."[12]

26   _____

27   [11] Erin Gibson et. al, *The relationship between videogame micro-transactions and problem gaming and gambling: A systematic review*, 131 Computers in Human Behavior 107219 (2022).

28   [12] *Id.*

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

61.    Thus, by luring players into making several smaller, time-sensitive purchases of purportedly high-value packs, Defendants specifically intend to foster addictive behaviors by luring consumers into dangerous spending habits.

62.    As a result of Defendants' predatory monetization schemes and false advertising, numerous players, like Plaintiffs, end up spending tens of thousands—if not hundreds of thousands—of dollars on KOA.

63.    As an editorial in the Society for the Study of Addiction has observed:

> Predatory monetization schemes in video games are purchasing systems that disguise or withhold the long-term cost of the activity until players are already financially and psychologically committed. Such schemes contribute to the increasing similarity of gaming and gambling and the potential for financial harm for those with Internet gaming disorder.
>
> . . .
>
> Game monetization schemes have become increasingly sophisticated and have been featured more prominently within popular on-line games. In our view, some of these schemes could be considered predatory. Predatory monetization schemes typically involve in-game purchasing systems that disguise or withhold the true long-term cost of the activity until players are already financially and psychologically committed. Such schemes are designed to encourage repeated player spending using tactics or elements that may involve, either singularly or in combination, limited disclosure of the product; intrusive and unavoidable solicitations; and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play. Such strategies may exploit inequalities in information between purchaser and provider, such as when the industry uses knowledge of the player's game-related preferences, available funds and/or playing and spending habits, to present offers predetermined to maximize the likelihood of eliciting player spending.[13]

64.    Layered on top of its predatory and addictive monetization schemes, KOA relies on four primary categories of deceptive pack advertisements within KOA: (a) packs that offer the illusion of price discounts through the strikethrough graphics, hereafter referred to as "False Strikethrough Packs"; (b) packs that falsely advertise that a pack contains extra value by containing an extra percentage increase value relative to normal versions of the same pack, hereafter referred to as "False Bonus Packs"; (c) packs that

---

[13] https://onlinelibrary.wiley.com/doi/epdf/10.1111/add.14286.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

falsely allege the limited availability of purchases, hereafter referred to as "False Limited Availability Packs"; and (d) items that "randomly" generate an in-game prize once purchased, hereafter referred to as "Loot Boxes." Any deceptively advertised pack can belong to more than one of these categories simultaneously or may be deceptive for a separate reason outside of the ones belonging to the four main categories.

65.    However, these advertisements are false, deceptive, and intended to mislead players into making in-app purchases that they otherwise would not have made.

66.    Defendants falsely promote these packs as being on sale or discounted by misrepresenting that such packs are currently being offered at a lower price than normal, include limited-time bonuses that purport to substantially increase the value of the packs, or have limited availability. Since the game pits players against each other, there is significant pressure on players to take advantage of these limited-time offerings so that they can gain a competitive edge against opponents who presumably are left to pay full price.

67.    Additionally, the advertisements mislead players into believing they will find themselves at a competitive *disadvantage* if they do not purchase packs now, since they will be left paying full price for items their opponents were able to purchase at a discount.

**False Strikethrough Packs**

68.    The False Strikethrough Packs display an advertised price for which the pack is currently offered. On the left side of the arrow graphic is a significantly higher price struck through with a red "X". The advertisements suggest that the pack was formerly offered at



KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   the higher price but is now heavily discounted.

2       69.     However, these packs were in fact never offered at the advertised former

3   reference price.

4       70.     There are dozens of False Strikethrough Packs sold at multiple pricing tiers,

5   including: "New Server Limited Summon Bundle," packs that purport to offer in-game

6   resources across the $4.99, $9.99, and $19.99 pricing tiers. None of these packs were

7   ever offered at the former reference prices.

8       71.     Defendants use false reference pricing schemes to increase sales because

9   they know these reference prices influence purchasing decisions, as consumers want

10  bargains. Fake discounting and false reference prices are widely recognized to be powerful

11  tools in convincing customers to make purchases, and this issue has been studied

12  repeatedly. As one recent research study from the Harvard Business School summarized:

> Taken together, evidence from our analysis of observational transaction data
> and our laboratory experiment suggests that fake prices provide sellers with
> a powerful tool to enhance demand, but one that may come at the expense
> of misleading consumers about products' true initial selling prices.
> Consumers take initial prices as signals of product quality and rate offers as
> being better deals the higher these initial prices are with respect to present
> selling prices. Accordingly, fake prices have the highest influence on
> purchase likelihood for less-informed consumers.
>
> . . .
>
> By definition, a fake price offers a fake discount—a discount that does not
> represent a decrease from some previous selling price but, rather, the
> difference between the current selling price and a fake introductory price.
> There is much existing literature on the impact of discounts on consumer
> behavior beyond . . .[14]

23      72.     Defendants had actual knowledge that the False Strikethrough Packs

24  contained false or misleading representations as to their former prices. Defendants

25  designed and promoted these advertisements from 2016 until the present day, as the

---

[14] Donald Ngwe, *Fake Discounts Drive Real Revenues in Retail,* Harvard Business
School Working Paper (2018) (available at
https://www.hbs.edu/ris/Publication%20Files/18-113_16977967-84c0-488d-96e5-
ffba637617d9.pdf)

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

practice of offering these deceptive packs continues.

73.    The price at which a pack is obtained is a material consideration when reasonable players, including Plaintiffs, decide to make purchases. Players seek to maximize the amount of items obtained from the pack for the lowest cost. Defendants deceive players into taking advantage of discounts so that players believe they may achieve a competitive advantage on the mistaken belief that other players may have to pay the substantially higher non-discounted price for the same number of items.

74.    Plaintiffs and the Classes reasonably relied on the "strikethrough" pricing when purchasing numerous False Strikethrough Packs. Had Plaintiffs known the "strikethrough" pricing was false, Plaintiffs would not have purchased many of the False Strikethrough Packs that they purchased.

75.    If Plaintiffs and the Classes could ever have reasonably realized that the False Strikethrough Packs were never sold at the original reference price, such realization would have occurred only after enough game play that Defendants would have already achieved their goal of establishing addictive spending habits. Thus, to the extent Plaintiffs or any of the Classes continued to make purchases after developing an understanding that the packs were never offered at the original price, this was the calculated and intended result that Defendants sought when engaging in this deceptive and unfair practice in the first place.

**False Bonus Packs**

76.    The False Bonus Packs also falsely advertise that a pack possesses extra value by containing a specific percentage increase in items or resources relative to normal versions of the same pack. The false percentage is indicated by a large and attention-grabbing bubble in the pack's graphical advertisement that contains a quantitative claim regarding the increase in value of this pack relative to packs which are not on sale.



77.     For example, the Primal Dragon Scale Special Bundle pack is offered with a graphical image of a red bubble containing "2423%"—indicating to a reasonable consumer that this specific pack is discounted because it contains a 2423% increase in the value or quantity of items contained within it when compared to a Primal Dragon Scale Special Bundle pack without such a representation.

78.     Defendants intentionally designed the packs to mislead players into believing that the packs represented a sale value, including both a false original reference price and an illusory increase in value, to induce those players to purchase the packs. Defendants knowingly took those ordinary item packs and simply placed a percentage graphic on the ad copies without altering anything else.

79.     Defendants have been promoting these False Bonus Packs from 2016 until present day, as the practice continues.

80.     Plaintiffs all reasonably relied on the percentage graphics on the False Bonus Packs as a material consideration in purchasing those packs. Had the Plaintiffs known the packs were not actually on sale in the manner represented, they would not have purchased the False Bonus Packs.

**False Limited Availability Packs**

81.     The False Limited Availability Packs indicate that a particular pack can only be purchased a finite number of times within the server. For example, text underneath a pack advertisement may say "Only 1 remaining!" These advertisements create a sense of

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

artificial scarcity whereby players are pressured into purchasing packs containing valuable items to enhance their accounts, ostensibly to simultaneously deprive competitors from accessing the same packs.



82.     As shown above, Defendants also use graphics indicating a "Remaining Time" during which the pack will remain available to create a false sense of scarcity with its users.

83.     However, Defendants' representations as to the scarcity of the packs are false. Other players are also able to purchase these packs even if another player buys all of the supposedly remaining packs. Furthermore, the player who purchased the False Limited Availability Pack is often offered the same pack to purchase again, especially at the $99.99 pricing tier.

84.     Defendants intentionally designed the packs to mislead players into believing that the packs were limited in availability. Defendants knowingly added a message to players communicating an artificial scarcity to induce them to purchase the packs immediately.

85.     These false and deceptive tactics of scarcity and urgency are effective dark patterns.

86.     As the FTC explained, "SCARCITY" includes variants such as the "False Low Stock Message" (e.g., "Only 1 left in stock—order soon"), which falsely claim inventory is low.  This message "[c]reate[s] pressure to buy immediately."

87.   "URGENCY" includes variants such as the "Baseless Countdown Timer" ("Offer ends in 00:59:48"), which shows a clock that goes away or resets when it times out; "False Limited Time Message" ("Deal ends soon"), which presents a meaningless deadline that resets when reached; or "False Discount Claims" ("Sale"). All of these variants create pressure to buy immediately.

88.   Plaintiffs all reasonably relied on the textual advertisements of supposed scarcity accompanying the ad copy as a material consideration in purchasing those packs. Had the Plaintiffs known the packs were not actually scarce or limited, they would not have purchased the False Limited Availability Packs.

**Loot Boxes**

89.   Amplifying the addictive features of KOA, Defendants also entice players to purchase Loot Boxes.

90.   The use of Loot Boxes within KOA and other freemium games encourages further and unregulated problem gambling behavior[15] by providing players with the opportunity to purchase items that yield randomized awards—mirroring gambling through uncertainty in the outcomes of spending.

91.   Loot Boxes allow players to purchase virtual "chances" to win rare in-game items, but most players win only common virtual items, which can often be purchased for far less than what the players spend on a "chance" at rare in-game loot.

92.   While this may sound similar to traditional gambling games, Loot Boxes contain only virtual items and not physical objects, and therefore are generally not subject to laws that typically apply to gambling activities.

93.   Loot Boxes are classified as a type of "monetary dark pattern," and as such KOA, "a video game that employs loot boxes[,] is just utilizing the 'monetized rivalries' dark

---

[15]  Matthew E. Perks, "Regulating In-Game Monetization: Implications of Regulation on Games Production," (2021), available at https://www.jstor.org/stable/pdf/j.ctv1hp5hqw.14.pdf?refreqid=excelsior%3Ae35b9894f003556c7dff9d435726e0dc&ab_segments=0%2Fbasic_search_gsv2%2Fcontrol&origin=&acceptTC=1, p. 221.

1  pattern"—the exploitation of user competitiveness which encourages players to spend

2  money they would not otherwise spend, in order to achieve status.[16]

3       94.    Further, academic literature on the subjects of predatory monetization and

4  addiction to loot-box-microtransactions suggests that there is a link between chance-based

5  gambling and player behavior on these apps. Studies in psychology show that loot box

6  consumption mimics gambling as it involves the betting and spending of real currency for

7  unpredictable in-game rewards, with the ambiguity of the valuation for in-game vs. real-

8  world currency making this a habit that is easy to fall into.[17]

9       95.    The similarities between gambling and Loot Boxes are especially dangerous

10 for individuals who are already problem gamblers, as the high degree of likeness to other

11 forms of gambling may cause them "to spend large amounts of money on buying loot boxes

12 in games, just as they would spend large amounts of money on other forms of gambling."[18]

13      96.    This is particularly problematic because studies have repeatedly confirmed

14 that problematic and pathological gambling habits develop at a higher rate among those

15 who participate in virtual, online gambling activities.[19]

16      97.    Additionally, younger individuals (those under 30 and, in particular, those

17 under 18) are particularly susceptible to developing problematic gambling pathologies,

18 including gambling addiction.[20]

19

[16] Lewis, *supra* note 17.

[17] Tom Brock, Mark Johnson, *The Gamblification of Digital Games*, 21 J. Consumer Culture (2021) available at https://journals.sagepub.com/doi/full/10.1177/1469540521993904.

[18] David Zendle, Paul Cairns, *Video Game Loot Boxes are Linked to Problem Gambling: Results of a Large-scale Survey*, PLOS ONE (2018), available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0206767.

[19] *See, e.g.*, Brunelle, Leclerc, Cousineau, Dufour, Gendron, & Martin, *Internet gambling, substance use, and delinquent behavior: An adolescent deviant behavior involvement pattern*, 26 Psych of Addictive Behaviors 365-70 (2012), available at https://doi.org/10.1037/a0027079.

[20] *See* Kristjansdottir *et al*, *Internet gambling and problem gaming among 13 to 18 year old adolescents in Iceland*, 9 Int'l J. Mental Health & Addiction 257 (2011), available at https://doi.org/10.1007/s11469-010-9280-7; *Gainsbury et al*, The Impact of Internet Gambling on Gambling Problems: A Comparison of Moderate-Risk and Problem Internet and Non-Internet Gamblers, 27(4) Psychology of Addictive Behaviors (2013), available at https://psycnet.apa.org/fulltext/2013-05953-001.pdf.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

98.    KOA, which is marketed to individuals 13 and older, leverages these predispositions to foster addiction and other pathological behaviors with its chance-based loot box system.

99.    Upon information and belief, Defendants are aware of the addictive nature of Loot Boxes and have designed KOA specifically to leverage consumer psychology in an effort to maximize consumer addiction and promote virtual gambling.

100.    KOA employs Loot Boxes in the form of its "Summoning Circle," where players encounter a graphical depiction of two different heroes: "Normal" and "Advanced," with the "Advanced" summons requiring premium currencies:





101.    Specifically, "Advanced" mode requires a player to obtain "Gold Summoning Horns," which the game describes as being "[u]sed to summon Heroes in the Summoning Circle":

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

102. Within the Summoning Circle, there is no published drop rate that is readily apparent. Instead, players must intuit that they should tap on the intentionally unobtrusive "?" at the top left of each hero's portrait. Doing so takes them to a screen that, at first blush, continues to suggest that summoning will yield a hero:



103. The "Summoning Preview" depicts only a list of heroes, with no bar, arrows, or other indicator for players to scroll. Only by tapping and dragging on the screen would a player discover that, in fact, the Summoning Circle also drops hero "fragments" (puzzle pieces that, eventually, can be combined into a hero once a player has acquired enough).

104. All of this is an intentional design by Defendants to disguise the fact that **in the vast majority of cases, summoning a "hero" in the Summoner's Circle will not summon a hero at all.** In fact, despite the deceptive graphics, the description of the "Gold Summoning Horn," and the misleading pop-up, the odds of obtaining **any** hero when using the Summoning Circle's "Advanced" mode to summon heroes are only 22.65%--less than one in four.

105. That fact is particularly poignant when one notes that even the most house-friendly slot machines in the country have a payout rate of approximately 80%.[21]

## CLASS ALLEGATIONS

106. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of themselves and the following proposed "Global Class":

---

[21] *See* Slot Machine Payback Statistics, American Casino Guide, *available at* https://www.americancasinoguide.com/info/slot-machine-payback-statistics.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1

2

> All persons, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability packs, and/or Loot Boxes, and/or such subclasses as the Court may deem appropriate.

3

4

107.    Plaintiff Yovanni Yanez also brings this action on behalf of himself and on

5

behalf of the following subclass (the "California Class"):

6

> All persons in California, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability packs, and/or Loot Boxes and/or such subclasses as the Court may deem appropriate.

7

8

9

108.    Plaintiff Emelyn Matos also brings this action on behalf of herself and on

10

behalf of the following subclass (the "New York Class"):

11

> All persons in New York, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability packs, and/or Loot Boxes, and/or such subclasses as the Court may deem appropriate.

12

13

14

109.    Excluded from the proposed Classes are Defendants and their employees,

15

officers, directors, legal representatives, heirs, successors, subsidiaries, and affiliates, and

16

the judicial officers and their immediate family members and associated court staff

17

assigned to this case, as well as all persons who make a timely election to be excluded

18

from the proposed Classes.

19

110.    Certification of Plaintiffs' claims for class-wide treatment is appropriate

20

because Plaintiffs can prove the elements of their claims on a class-wide basis using the

21

same evidence they would use to prove those elements in individual actions alleging the

22

same claims.

23

111.    This action meets all applicable standards of Fed. R. Civ. P. 23 for class

24

certification, in that Plaintiffs can demonstrate the elements delineated below.

25

112.    **Numerosity.** The members of the proposed Classes are so numerous and

26

geographically dispersed that individual joinder of all proposed class members is

27

impracticable. *See* Fed. R. Civ. P. 23(a)(1). While Plaintiffs believe that there are hundreds

28

of thousands of members of the proposed Classes, the precise number of class members

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

is unknown, but may be ascertained from Defendants' books and records. On information and belief, Defendants maintain a list of users that includes personal information for the user including their email addresses, whether they have made in-app purchases, and which in-app purchases they have made.

113.    Applying a reasonable and prudent person standard to the users of KOA under the same or similar circumstances, each user would qualify to be a class member requesting the right to cancel and obtain refunds on their in-app purchases. Any reasonable and prudent person under the same or similar circumstances wants to have the flexibility to disaffirm an in-app purchase that was made while believing that the packs they purchased were part of a sale or promotion but, in reality, were not.

114.    **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual class members. *See* Fed. R. Civ. P. 23(a)(2) and (b)(3). These include, without limitation:

    a.  Whether Defendants engaged in the conduct alleged in this Complaint;

    b.  Whether Defendants violated the applicable statutes alleged herein;

    c.  Whether Defendants designed, advertised, marketed, distributed, sold, or otherwise placed KOA into the stream of commerce in the United States;

    d.  Whether Defendants' conduct emanated from the State of California;

    e.  Whether Plaintiffs and the class members are injured and harmed directly by Defendants' false advertising designed to entice users into making in-app purchases they otherwise would not have made;

    f.  Whether Plaintiffs and the class members are entitled to damages due to Defendants' conduct as alleged in this Complaint, and if so, in what amounts; and

    g.  Whether Plaintiffs and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint.

115.    **Typicality.** Plaintiffs' claims are typical of the putative class members' claims

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  because, among other things, all such class members were comparably injured through

2  Defendants' wrongful conduct as described above. *See* Fed. R. Civ. P. 23(a)(3).

3  Defendants' creation and display of its misleading advertisements is uniform for all

4  Plaintiffs and class members.

5      116.   **Adequacy.** Plaintiffs are adequate proposed class representatives because

6  their interests do not conflict with the interests of the other members of the proposed

7  Classes they seek to represent, because they have retained counsel competent and

8  experienced in complex class action litigation, and because they intend to prosecute this

9  action vigorously. The interests of the proposed Classes will be fairly and adequately

10  protected by Plaintiffs and their counsel. *See* Fed. R. Civ. P. 23(a)(4).

11      117.   **Declaratory and Injunctive Relief.** Defendants have acted or refused to act

12  on grounds generally applicable to Plaintiffs and the other members of the proposed

13  Classes, thereby making appropriate final injunctive relief and declaratory relief, as

14  described below, with respect to the proposed Classes as a whole. *See* Fed. R. Civ. P.

15  23(b)(2). Defendants' wrongful conduct alleged herein is grounded in the creation and

16  dissemination of their pack offerings in-game, which are displayed uniformly. Plaintiffs' and

17  the class members' injuries are real, immediate, and ongoing. Plaintiffs and class members

18  seek injunctive and declaratory relief from Defendants.

19      118.   **Superiority.** A class action is superior to any other available means for the

20  fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be

21  encountered in the management of this class action. The damages or other financial

22  detriment suffered by Plaintiffs and putative class members are relatively small compared

23  to the burden and expense that would be required to individually litigate their claims against

24  Defendants, so it would be impracticable for members of the proposed Classes to

25  individually seek redress for Defendants' wrongful conduct.

26      119.   Applying the principles of equity or balance of equities, expecting an

27  individual Plaintiff who is at a disadvantage with limited resources and spending capacity,

28  and with minimal negotiating power, if any, to litigate claims against Defendants,

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

multibillion-dollar corporations that have immense resources and deep pockets, would be unfair. Class actions are a necessary and essential means to provide for public interest litigations with checks and balances to curtail deceptive practices by powerful private corporations, including Defendants.

120.    There is no special interest in class members individually controlling the prosecution of separate actions. And even if class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and it increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. *See* Fed. R. Civ. P. 23(b)(3).

## CALIFORNIA LAW APPLIES TO ALL CLASSES

121.    California's substantive laws apply to every class member, regardless of where the class member resides.

122.    California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

123.    FunPlus and its various operating entities were founded in California. FunPlus maintains offices in California, and its co-founders and key executives reside in California. On information and belief, Defendants' principal places of business are located in California. FunPlus conducts substantial business in California. Therefore, California has an interest in regulating Defendants' conduct under its laws.

124.    FunPlus's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94o8

125.    California is also the state from which Defendants' alleged misconduct and false statements emanated. This conduct similarly injured and affected Plaintiffs and all other class members.

126.    The application of California laws to the Classes is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Classes, and California has a greater interest in applying its laws here than any other interested state.

**FIRST CLAIM FOR RELIEF**

**Violation of California's Unfair Competition Law ("UCL")**

**Cal. Business & Professions Code §§17200** *et seq.*

**(By Plaintiffs, individually and on behalf of All Classes)**

127.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

128.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

129.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

130.    A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

131.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

132.    Defendants have violated the "unlawful" prong under the UCL and have engaged in "unfair, deceptive, untrue or misleading" advertising.

133.    The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

schemes—similar to Defendants' False Strikethrough Packs and False Bonus Packs in all

material respects—as deceptive practices that would violate the FTC Act.

134.  16 C.F.R. §233.1 states:

(a)  One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b)  A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith—and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

135.  California law also prohibits false former pricing schemes. Cal. Bus. & Prof. Code §17501, entitled "Value determinations; Former price advertisements," states:

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

136.  As further detailed in the Second Claim for Relief below, California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1    amounts of price reductions." Id. §(a)(13).

2        137.   Defendants' False Strikethrough Packs, False Bonus Packs, False Limited

3    Availability Packs, and Loot Boxes violate the unlawful prongs of the UCL since they violate

4    16 C.F.R. §233.1, Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §§1770(a)(9) and

5    (a)(13).

6        138.   The False Bonus Packs misrepresent the existence of a sale whereby

7    players can allegedly purchase more items and resources from a pack than they normally

8    could for the same price.

9        139.   Defendants' use of the False Bonus Packs violates 15 U.S.C. §45(a)(1), 15

10   U.S.C. §52(a), and the FTC Guidelines published in Title 16, Code of Federal Regulations,

11   Section 233.

12       140.   Defendants also violated and continue to violate Cal. Bus. & Prof. Code

13   §17501, and Cal. Civ. Code §1770, sections (a)(9) and (a)(13), by advertising false

14   discounts from purported former prices that were, in fact, not the prevailing market prices

15   within three months preceding the publication and dissemination of advertisements

16   containing the false former prices.

17       141.   Defendants have also violated the "unfair" prong of the UCL by falsely

18   representing that its consumers received a discount from a referenced "original" former

19   price of its False Strikethrough Packs where, in fact, Defendants set an arbitrary price for

20   the goods contained in these packs and then falsely represented the packs had ever been

21   offered for sale without their supposed discount.

22       142.   Additionally, Defendants have violated the "unfair" prong of the UCL by

23   falsely representing that their False Bonus Packs contained unique and specific increases

24   in items or resources when, in fact, they contained the same resources and in-game items

25   as they always do.

26       143.   Defendants have also violated the "unfair" prong of the UCL by engaging in

27   predatory practices designed to foster gambling addiction in consumers, in that they: (a)

28   deploy their microtransactions in a way specifically designed to ensnare players into

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

addictive spending habits; (b) falsely create a sense of urgency, scarcity, and value in order to secure addictive high frequency microtransactions, such as by deploying Loot Boxes, which exploit user competitiveness and foster addiction; and (c) use incremental cost step-ups to prevent players from realizing the true cost of the game and how much they have spent. Defendants' goals in engaging in these practices are far outweighed by the harm they cause.

144.    These acts and practices are unfair because they were likely to cause consumers to falsely believe that Defendants were offering value, discounts, or bargains from the prevailing market value or worth of the products sold that do not, in fact, exist. As a result, purchasers (including Plaintiffs) reasonably understood that they were receiving valuable price reductions on purchases of in-game items. This, in turn, has induced reasonable purchasers to buy such products from Defendants that they would not have otherwise purchased.

145.    The gravity of the harm to Plaintiffs and members of the Classes resulting from these unfair acts and practices outweighs any conceivable reasons, justifications, or motives that Defendants may have had for engaging in such deceptive acts and practices.

146.    Additionally, Defendants have violated the "fraudulent" prong of the UCL because their marketing and advertising materials included false "original" prices for their False Strikethrough Packs, and because these same materials also suggested that the offers in the False Bonus Packs and False Limited Availability Packs were unique, limited, and would no longer be available at those price points following the conclusion of its sale events. In actuality, the packs never contained the limited-time deals or discounts they purported to offer.

147.    Defendants' acts and practices deceived Plaintiffs and the Classes at large. Specifically, Plaintiffs and the Classes relied on these misleading and deceptive representations regarding the limited-time bonuses they could expect to receive in the packs. Each of these representations and deceptions played a substantial role in Plaintiffs' decisions to purchase the packs, and Plaintiffs would not have done so in the absence of

1  such representations.

2       148.   Plaintiffs and the Classes never received the benefit of their bargains with

3  Defendants, in that the "discounted" resources offered for sale in the packs did not give

4  them the anticipated competitive edge against their opponents. Competitors could simply

5  purchase packs at the same false sale pricing, or with the same number of items, or the

6  same pack availability, notwithstanding Defendants' representations that these were

7  limited-time offers.

8       149.   Similarly, players who purchased the False Bonus Packs and the False

9  Strikethrough Packs defensively (to protect against becoming overpowered by opponents

10  who they believed had been able to take advantage of the purportedly limited-time

11  bonuses) were deprived of the benefit of their bargains, because the threat itself was a

12  fabrication. There was never a risk of falling behind due to a player's failure to purchase

13  items at their discounted price, because the price was always discounted.

14       150.   As a result of these violations under each of the fraudulent, unfair, and

15  unlawful prongs of the UCL, Defendants have been unjustly enriched at the expense of

16  Plaintiffs and members of the proposed Classes. Specifically, Defendants have been

17  unjustly enriched by obtaining revenues and profits that they would not otherwise have

18  obtained absent their false, misleading, and deceptive conduct.

19       151.   Through their unfair acts and practices, Defendants have improperly

20  obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this

21  Court cause Defendants to restore this money to Plaintiffs and all class members, and to

22  enjoin them from continuing to violate the UCL, and/or from violating the UCL in the future.

23  Otherwise, Plaintiffs, the class members, and members of the general public may be

24  irreparably harmed and/or denied an effective and complete remedy if such an order is not

25  granted.

26  //

27  //

28  //

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   **SECOND CLAIM FOR RELIEF**

2   **Violation of California's False Advertising Law ("FAL")**

3   **Cal. Business & Professions Code §§17500 *et seq.***

4   **(By Plaintiffs, individually and on behalf of All Classes)**

5       152.   Plaintiffs incorporate by reference all allegations in this Complaint and restate

6   them as if fully set forth herein.

7       153.   The FAL prohibits unfair, deceptive, untrue, or misleading advertising,

8   including, but not limited to, false statements as to worth, value, and former price.

9       154.   Furthermore, the FAL provides that: "No price shall be advertised as a former

10  price of any advertised thing, unless the alleged former price was the prevailing market

11  price as above defined within three months next immediately preceding the publication of

12  the advertisement or unless the date when the alleged former price did prevail is clearly,

13  exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code §17501.

14      155.   The False Strikethrough Packs and the False Bonus Packs misrepresent the

15  existence of a sale whereby players can allegedly purchase packs at a discounted price,

16  or with an increased percentage of items or resources. The False Limited Availability Packs

17  misrepresent the exclusive nature, and therefore competitive value, of the packs.

18      156.   Through their unfair acts and practices, Defendants have improperly

19  obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this

20  Court cause Defendants to restore this money to Plaintiffs and all class members, and to

21  prevent Defendants from continuing to violate the FAL, and/or from violating the FAL in the

22  future. Otherwise, Plaintiffs, the class members, and members of the general public may

23  be irreparably harmed and/or denied an effective and complete remedy if such an order is

24  not granted.

25  //

26  //

27  //

28  //

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**THIRD CLAIM FOR RELIEF**

**Violation of the California Consumers Legal Remedies Act ("CLRA")**

**Cal. Civ. Code. §§1750** *et seq.*

**(By Plaintiffs, individually and on behalf of All Classes)**

157.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

158.    Plaintiffs and the other class members are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

159.    Defendants are "persons" within the meaning of Cal. Civ. Code §§1761(c) and 1770, and they sell "goods or services" within the meaning of Cal. Civ. Code §§1761(a)–(b) and 1770.

160.    KOA and the in-app purchases are a "good" or "service" within the meaning of Cal. Civ. Code. §§1761(a) and (b).

161.    Defendants have violated Cal. Civ. Code. §1770(a)(5)'s proscription against representing that goods have characteristics, uses, benefits, or quantities that they do not have. The False Limited Availability Packs represent that they have the benefit of conferring a competitive advantage, but those benefits are illusory.

162.    Defendants have violated Cal. Civ. Code. §1770(a)(9)'s proscription against advertising goods or services with intent not to sell them as advertised. The False Bonus Packs falsely advertise that a pack of goods has extra value by containing a significant increase in items or resources relative to normal versions of the same pack. The False Limited Availability Packs falsely indicate that a particular pack can only be purchased a finite number of times by competing players.

163.    Defendants have violated Cal. Civ. Code. §1770(a)(13)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of discounts via False Strikethrough Packs, misrepresenting the existence of special sales through their False

1    Bonus Packs, and misrepresenting the exclusive nature, and therefore competitive value,

2    of the packs through their False Limited Availability Packs.

3        164.   Defendants have violated Cal. Civ. Code. §1770(a)(14)'s proscription against

4    representing that a transaction conferred rights or obligations that it did not have. The False

5    Limited Availability Packs falsely represent that the purchase confers the right of a

6    competitive advantage, which it does not.

7        165.   Defendants have violated Cal. Civ. Code. §1770(a)(16)'s proscription against

8    representing that the subject of a transaction has been supplied in accordance with a

9    previous representation when it has not by misrepresenting that the purchasers have

10   received a competitive advantage in the game by purchasing "sale" and "limited

11   availability" items.

12       166.   Defendants have violated Cal. Civ. Code. §1770(a)(17)'s proscription against

13   representing that the consumer will receive an economic benefit, if the earning of the

14   benefit is contingent on an event to occur subsequent to the consummation of the

15   transaction, by misrepresenting that the purchaser of False Limited Availability Packs

16   would receive an economic benefit (i.e., more goods than other players) and therefore a

17   competitive advantage as compared to players who did not take advantage of limited-

18   availability sales. The economic benefit is contingent on other players not purchasing those

19   same packs, but there is not actually a limited supply of packs.

20       167.   Plaintiffs and the other class members suffered actual damages as a direct

21   and proximate result of the Defendants' actions, concealment, and/or omissions in the

22   advertising, marketing, and promotion of their in-app purchases, in violation of the CLRA,

23   as evidenced by the substantial sums Defendants pocketed from Plaintiffs and the class

24   members.

25       168.   Plaintiffs, on behalf of themselves and the class members, demand judgment

26   against Defendants for injunctive relief and attorney's fees.

27   //

28   //

1

2

3

**FOURTH CLAIM FOR RELIEF**

**Fraud**

**(By Plaintiffs, individually and on behalf of All Classes)**

4     169.    Plaintiffs incorporate by reference all allegations in this Complaint and restate

5   them as if fully set forth herein.

6     170.    Defendants represented to all Plaintiffs that various purchased packs were

7   on sale in that they were offered at a lower price than normal, that certain packs were

8   offered with an increased percentage of items and resources compared to their normal

9   counterparts, and that pack purchases were only available in limited quantities.

10    171.    These representations were false because the packs were never offered at

11   higher prices, the increased percentage versions of the packs were identical to their normal

12   counterparts, the packs were not actually available in scarce quantities to other players in

13   the State or to the individual player making the purchases, and the stated number of other

14   players that had purchased the packs was fictitious.

15    172.    Defendants    intentionally    designed    the    graphical    images    on    the

16   advertisements to attract Plaintiffs to the enticing but false claims regarding the existence

17   of sales, item and resource bonuses, and artificial scarcity.

18    173.    Plaintiffs    reasonably    relied    upon    the    claims    made    in    Defendants'

19   advertisements in deciding to purchase the aforementioned packs.

20    174.    Upon purchasing the packs, Plaintiffs were harmed because, had Plaintiffs

21   known Defendants' claims were false, they would not have made those purchases.

22    175.    Plaintiffs'    reliance    on    Defendants'    misrepresentations    in    their    pack

23   advertisements was a substantial factor in causing harm to Plaintiffs.

24    176.    Defendants' conduct has therefore caused and is causing immediate and

25   irreparable injury to Plaintiffs and the class members and will continue to both damage

26   Plaintiffs and the class members and deceive the public unless enjoined by this Court.

27   //

28   //

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

**FIFTH CLAIM FOR RELIEF**

**Unjust Enrichment**

**(By Plaintiffs, individually and on behalf of All Classes)**

177.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

178.    Defendants misrepresented the value of the items or resources purchased in the False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, and/or Loot Boxes or any packs for which Plaintiffs were double charged.

179.    Plaintiffs spent tens, if not hundreds, of thousands of dollars each on items and resources, induced by Defendants.

180.    It would be unfair for Defendants to keep the money spent without compensating Plaintiffs.

**SIXTH CLAIM FOR RELIEF**

**(Violation of N.Y. Gen. Bus. Law §§349 & 350)**

**(By Emelyn Matos, individually and on behalf of the New York Class)**

181.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

182.    Plaintiff Emelyn Matos hereby brings this Claim, under New York General Business Law §§349 & 350, against both Defendants on behalf of herself and the New York Class.

183.    Defendants' conduct was misleading, deceptive, unlawful, fraudulent, and unfair by virtue of offering False Strikethrough Packs, False Bonus Packs, and False Limited Availability Packs as in-app purchases for sale through the KOA app.

184.    Defendants caused to be disseminated through New York State and elsewhere, through advertising, marketing, and other publications, statements that were untrue and misleading, and which they knew were untrue and misleading.

185.    Defendants' misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were and continue

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    to be exposed to Defendants' material misrepresentations.

2         186.    Plaintiffs and the class members have been injured by Defendants' deceptive

3    acts or practices.

4         187.    Plaintiffs and the class members have no adequate remedy at law.

5         188.    Defendants' conduct has caused and is causing immediate and irreparable

6    injury to Plaintiffs and the Classes and will continue to both damage Plaintiffs and the

7    Classes and deceive the public unless enjoined by this Court.

8         189.    Any person who has been injured by reason of any violation of NY GBL §349

9    may bring an action in his or her own name to enjoin such unlawful acts or practices, an

10   action to recover their actual damages or $50, whichever is greater, or both such actions.

11   The court may, in its discretion, increase the award of damages to an amount not

12   exceeding three times the actual damages, in addition to $1,000 per violation, if the court

13   finds that a defendant willfully or knowingly violated this section. The court may award

14   reasonable attorney's fees to a prevailing plaintiff.

15        190.    Pursuant to NY GBL §350(e), Plaintiff and the New York Class seek

16   monetary damages (including actual damages, or $500, whichever is greater, and

17   minimum, punitive, or treble and/or statutory damages pursuant to NY GBL §350(a1)),

18   injunctive relief, restitution, and disgorgement of all monies obtained by means of

19   Defendants' unlawful conduct, interest, and attorney's fees and costs.

20                              **PRAYER FOR RELIEF**

21        **WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray

22   for relief and judgment against Defendants as follows:

23        (a)     Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil

24   Procedure, appointing Plaintiffs as representatives of the Classes, and designating

25   Plaintiffs' counsel as class counsel;

26        (b)     Awarding Plaintiffs and the class members compensatory damages and

27   actual damages in an amount exceeding $5,000,000, to be determined by proof;

28        (c)     Awarding Plaintiffs and the class members appropriate relief, including actual

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    and statutory damages;

2        (d)    For punitive damages;

3        (e)    For civil penalties;

4        (f)    For declaratory and equitable relief, including a declaration that Defendants

5    violated and have continued to violate California's UCL, the FAL, and the CLRA, and an

6    injunction requiring Defendants to comport with California Business & Professions Code

7    §§17200, *et seq.*, and restitution and disgorgement;

8        (g)    For an order enjoining Defendants from continuing to engage in the wrongful

9    acts and practices alleged herein;

10       (h)    Awarding Plaintiffs and the class members the costs of prosecuting this

11   action, including expert witness fees;

12       (i)    Awarding Plaintiffs and the class members' reasonable attorney's fees and

13   costs as allowable by law;

14       (j)    Awarding Plaintiffs and the class members reasonable attorney's fees

15   pursuant to Cal. Civ. Proc. Code 1021.5, as this lawsuit seeks the enforcement of an

16   important right affecting the public interest and satisfies the statutory requirements for an

17   award of attorney's fees;

18       (k)    Awarding Plaintiffs and the class members reasonable attorney's fees and

19   costs, as well as injunctive relief, pursuant to the CLRA;

20       (l)    Awarding pre-judgment and post-judgment interest; and

21       (m)    Granting any other relief as this Court may deem just and proper.

22

23   Respectfully Submitted,

24   DATED: May 30, 2023                 **KRONENBERGER ROSENFELD, LLP**

25

26                                       By:  ___s/ Karl S. Kronenberger_____
                                              Karl S. Kronenberger
27
                                         *Attorneys for Plaintiffs and the Proposed*
28                                       *Classes*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**POLLOCK COHEN LLP**
Raphael Janove
rafi@pollockcohen.com
Adam Pollock
adam@pollockcohen.com
George Krebs
gkrebs@pollockcohen.com
111 Broadway, Ste. 1804
New York, NY 10006
Telephone: (212) 337-5361
*pro hac vice* forthcoming

**JAY KUMAR LAW**
Jay Kumar
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903
*pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Proposed Classes*

**DEMAND FOR JURY TRIAL**

Plaintiffs, by and through their undersigned counsel, hereby demand a trial by jury for all questions of fact that can be decided by a jury in the above-entitled action.

Respectfully Submitted,

DATED: May 30, 2023                    **KRONENBERGER ROSENFELD, LLP**

By: ___s/ Karl S. Kronenberger_____
           Karl S. Kronenberger

Attorneys for Plaintiffs and the Proposed Classes